**John DOE, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 93–63C.**

United States Court of Federal Claims.

Feb. 29, 1996.

Guy J. Ferrante, Falls Church, Virginia, for plaintiff. Craig M. Cornish, Colorado Springs, Colorado, of counsel.

Nuriye C. Uygur, Washington, DC, with whom were Assistant Attorney General Frank W. Hunger, David M. Cohen, Director, and James M. Kinsella, Assistant Director, for defendant. Steven J. Pecinovsky, Arlington, Virginia, of counsel.

## OPINION

ROBINSON, Judge:

Plaintiff John Doe[1] was discharged from the United States Air Force on February 13, 1987, "under other than honorable conditions." The discharge followed the affirmance by an Air Force Board of Review of an earlier recommendation by an Air Force Board of Inquiry that Mr. Doe be discharged. The board of inquiry (or "dis-charge board") had found that Mr. Doe had committed an indecent sexual act upon his minor daughter during a camping trip in 1981.

Plaintiff filed suit in this court under the Tucker Act after unsuccessfully pursuing relief before an Air Force Board for Correction of Military Records. Citing violations of his procedural rights, plaintiff asks the court to enter judgment for back pay from the date of his discharge through March 31, 1992, and for retirement pay from April 1, 1992, the date when plaintiff was originally scheduled to retire, to the present. Mr. Doe also asks the court to order the Secretary of the Air Force to correct his records.

### Factual Background

At the time of his discharge, Mr. Doe had accumulated 14 years and 10 months of active-duty service over a period covering more than 20 years of service in the regular Air Force and the Air Force reserves. Administrative Record ("AR") at 123–24. He received the rank of Major in the regular Air Force in 1979, and that was the rank he held when he was discharged. Mr. Doe's military career included a brief tour of duty in Korea and nearly a year in Vietnam, where Mr. Doe flew 179 combat missions and 13 combat support missions during 1970. Mr. Doe also taught biology at the Air Force Academy in Colorado Springs from 1979 to 1984. AR at 129. Among other decorations, Mr. Doe was awarded the Distinguished Flying Cross (1970), the Air Medal with Eight Oak Leaf Clusters (1970), the Air Force Commendation Medal (1979), and the Space Badge (1985). AR at 126.

The events which led to Mr. Doe's discharge began in March 1982, when Mr. Doe's minor daughter ("Jane") was hospitalized after she took an overdose of aspirin. AR at 1044. Several days after she was admitted, she told a doctor that her father had sexually molested her during a camping trip which they had taken together in July or August

---

1. At the parties' request, this Opinion uses pseudonyms for the names of the plaintiff and his family members. Other persons are identified only by initials.

1981.[2] *Id.* The doctor then contacted the Colorado Department of Social Services, which sent Ms. N., a social worker, to interview Jane in the hospital. AR at 1042. The interview took place on March 2, 1982, at what was then called Brady Hospital in Colorado Springs. AR at 1039–49.

After interviewing Jane, Ms. N. discussed the girl's allegations with Jane's mother, who was then married to Mr. Doe. The social worker did not interview Mr. Doe, but she did serve him with a temporary custody notice. AR at 1048. On March 8, 1982, Ms. N. prepared a report of the case ("transfer summary"[3]) which was forwarded to the district attorney for El Paso County, Colorado. AR at 1049. Shortly after Ms. N. filed the transfer summary, the district attorney's office notified the Air Force Office of Special Investigations ("OSI") that the allegations had been made. The notification sent to OSI included a copy of the transfer summary. AR at 1182.

On March 26, 1982, acting on a motion from Jane's guardian *ad litem*, the El Paso County District Court issued an order restricting access to the Department of Social Services records concerning the allegations. Under the court's order—which the parties in this case have referred to as a "gag order"—only Jane, her parents, their attorneys, and authorized court personnel were to have access to the records. AR at 394.

Despite the gag order, Ms. O., a detective employed by the El Paso County sheriff's office, sent a report to OSI on April 23, 1982, detailing her own investigation of the molestation allegations. She sent the report in response to a request from OSI. AR at 1182. Ms. O.'s report discussed the information contained in the transfer summary and also described two conversations she had had with Mr. Doe's attorney, Mr. G. According to the detective's report, Mr. G. told her Mr. Doe "had confessed" to him the assault described by Jane and that he "would have no problem in confessing fully to [Ms. O.] upon entry into the Incest Diversion Program, to avoid criminal filing with the District Attor-

ney's office." AR at 1065. After receiving the detective's report, OSI submitted a copy of it to the Superintendent of the Air Force Academy, where Mr. Doe was teaching at the time. AR at 400.

In January 1985 the Air Force attempted to obtain access to the records of the molestation case from the El Paso County court, petitioning the court to set aside the March 1982 gag order so that the Air Force could initiate administrative discharge proceedings against Mr. Doe. On January 24, 1985, the court denied the petition and issued an order clarifying the gag order. AR at 400. The court's clarifying order prohibited the state's investigative agencies from disclosing any information, in oral or written form, to the Air Force. AR at 410. On April 4, 1985, the court, from the bench, denied the Air Force's motion to set aside the gag order. AR at 425–35.

At the same hearing on April 4, 1985, the Air Force's attorneys, Messrs. B. and T., asked the court for permission to "authenticate" the transfer summary which OSI had obtained in 1982. The court granted the request but explained, from the bench, that its permission was limited to asking the Department of Social Services a single question, namely, "Is this an authentic document from your department?" AR at 435. Accordingly, the custodian of records for the El Paso County Sheriff's Office certified that the copy of the sheriff's report possessed by the Air Force was a true copy. AR at 1066. A similar authentication concerning the transfer summary was executed by a representative of the Department of Social Services. AR at 1042. The record does not reveal the date on which either authentication was executed.

At a later hearing, on April 19, 1985, the same Air Force lawyers advised the El Paso County court that they were in possession of the sheriff's report (in addition to the transfer summary), and the lawyers sought permission to have the sheriff's report "authenti-

---

2. According to the child, the alleged camping-trip incident was the only molestation incident which had occurred between herself and her father. AR at 1040.

3. In parts of the record of this case, including the transcript of the February 24, 1995, oral argument, the transfer summary is also called the "narrative summary."

cated." That same date, the court put its earlier reaffirmation of the gag order into writing. AR at 439–40. Expressing concerns for the privacy of Jane Doe and her family, the court's written order further specified that representatives of the Department of Social Services, of the Colorado Springs Police Department, and of the El Paso County sheriff's office (including the author of the sheriff's report) were enjoined from communicating any information about the case to anyone outside the court's own agencies. *Id.* On May 7, 1985, the court issued another written order which permitted the authentication of the sheriff's report and extended the gag order indefinitely. AR at 449–50. The court's order did not prohibit the Air Force from conducting its own investigation by contacting primary sources, *i.e.*, Mr. Doe, Jane, and other family members. In February 1985, however, Jane's attorney had advised the Air Force that she did not intend to discuss her allegations with the Air Force or its representatives. AR at 412.

Prior to the hearings discussed above, an Air Force selection board had convened to consider whether Mr. Doe should be promoted to the rank of lieutenant colonel. Citing the molestation allegations, the board declined to select him for promotion and instead issued an order directing him to show cause as to why he should be retained in the Air Force. AR at 404. The show-cause action was eventually terminated in February 1984 due to lack of documentary evidence to support the allegations. AR at 409. Later in 1984, Mr. Doe was again considered but not selected for promotion. He was sub-

sequently selected for continued active duty service at the rank of major. AR at 407.

The Air Force recommended discharge proceedings against Mr. Doe in 1986, again stating as its reason the alleged molestation incident. A board of inquiry was to be convened on July 2, 1986. AR at 454. On that date the board's Legal Advisor began the proceedings with an evidentiary hearing outside of the presence of the board members.[4]

Mr. Doe, through counsel, objected to the admission of the transfer summary and the sheriff's report because the documents were hearsay evidence which lacked sufficient indicia of reliability, in contravention of the applicable Air Force Regulation ("AFR").[5] AR at 792–96. With regard to the transfer summary, the Legal Advisor determined that those portions of the document which contained statements attributed to Jane Doe were inadmissible, stating, "This is hearsay upon hearsay and I find that there are no adequate safeguards for the truth of the statements of [Jane] to [Ms. N.]." AR at 805. He further commented, with regard to Jane's specific allegations,

> The problem I have ... is that the facts [are] consistent with so many other explanations, and there is so much evidence contained from the mother, for instance, and from the [transfer summary], that there were suicidal tendencies, and there ... were drugs involved, and there was a psychological problem, so that there are so many explanations for that obvious trauma that [Jane] was undergoing, that are not necessarily consistent with a molestation, that I don't find that that would be adequate corroboration for the statements.[6]

4. In an Air Force Board of Inquiry hearing, the role of the Legal Advisor is roughly analogous to that of a judge, the Recorder is roughly analogous to a criminal prosecutor, and the board itself, composed of lay military officers, is similar to a jury. The accused is called the Respondent.

5. Air Force regulations do not define hearsay. For the purpose of the present discussion, therefore, the court shall herein assume the applicability of the definitions provided by the Federal Rules of Evidence ("FRE"). While the court recognizes that the Federal Rules are not operative in administrative hearings, the following definitions from FRE 801 are helpful:
   (a) **Statement.**—A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.
   (b) **Declarant.**—A "declarant" is a person who makes a statement.
   (c) **Hearsay.**—"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

6. Because much of the administrative record cited in this case consists of transcripts of oral statements, the record quotations that appear in this Opinion contain several obvious, but minor, grammatical and syntactical errors. (The court notes these errors here in order to avoid frequent interruptions of "sic.")

AR at 808. As for the sheriff's report, the Legal Advisor did not find similar defects to its admissibility. However, he noted that without the account of the alleged molestation incident which was contained only in the transfer summary, those portions of the sheriff's report which referred to Jane's allegations lacked "corroboration." AR at 805. Because he had already ruled the portions of the transfer summary containing statements attributed to Jane inadmissible, the Legal Advisor concluded that the portions of the sheriff's report referring to Jane's allegations were also inadmissible. *Id.*

Apprised of the Legal Advisor's inclinations concerning the admissibility of the sheriff's report and the transfer summary, the Recorder sought to delay the proceedings so that additional evidence could be collected. Over the vehement objection of plaintiff's military counsel, the Legal Advisor granted the request. AR at 809–14.

Before the discharge proceedings were reconvened, Messrs. B. and T. attempted to obtain more information about Mr. Doe's case from sources in Colorado Springs. On July 15, 1986, the attorneys interviewed Ms. N., the social worker who prepared the transfer summary. The following day, the same attorneys interviewed Ms. O., the detective who prepared the sheriff's report. A court reporter was present to record both interviews and prepare transcripts. Neither Mr. Doe nor his attorney was present during the interviews, nor were they notified in advance that the interviews were to take place. Furthermore, the El Paso County court, whose gag order remained in effect, was also not notified about the interviews. However, an attorney representing El Paso County was present during the first interview and had, in fact, assisted the Air Force attorneys in making arrangements for both interviews.[7] AR at 513–14 and 544–47.

When the board of inquiry was reconvened shortly after the interviews were conducted, the Legal Advisor reconsidered the admissibility of the transfer summary and the sheriff's report in light of the interview transcripts. On July 29, 1986, at a pre-board hearing (*i.e.*, outside of the presence of the board members), the Legal Advisor announced his decision to admit the transfer summary, the sheriff's report, and the two interview transcripts into evidence. In doing so, the Legal Advisor explained:

[The interview transcript] is admitted. [The transcript] establishes that [Ms. N.] is an experienced caseworker and at the time she took the report in this case, she had at least two years experience.

In [the transcript] she explains that she found the allegations by [Jane] were sufficiently credible to cause her to decide to refer the case to an ongoing child protective unit, so a caseworker would be continuously involved in the case and also to have the case called up for a court hearing. There were no circumstances that caused her to disbelieve the statement. In making her determination that the allegations by [Jane] were credible she considered the delay in reporting the incident, any drug involvement and suicidal tendencies, and her experience determined that these factors did not make the statements of [Jane] any less credible.

Based on my ruling on [the interview transcript], I find adequate safeguards for the truth of [Jane's] statement to [Ms. N.] that appear in [the transfer summary] and I amend my earlier ruling with respect to [the transfer summary] and admit it into evidence, particularly those portions of the transfer summary that contain [Jane's] statements. Since I've admitted [the transfer summary] now, in its entirety, the statements of [Mr. G.] now have some corroboration, consequently [the sheriff's report and the transcript of Ms. O.'s interview] are admitted.

AR at 819.

Once the Legal Advisor had made the above ruling concerning the four exhibits,

---

7. The parties' briefs and the administrative documents alternately refer to the recorded meetings between the Air Force attorneys and Ms. N. and Ms. O as "interviews" and "depositions." Because of the ex parte nature of the meetings and because they were not conducted under the authority or supervision of any tribunal, this Opinion shall refer to the meetings as "interviews," not "depositions." The court notes, however, that the interview transcripts indicate that the interviewees were "duly sworn" and that the interviewees read and signed the transcripts.

Mr. Doe's attorney requested that the proceedings again be delayed so that he could attempt to interview or cross-examine Ms. N. and Ms. O. Recognizing that the government had successfully interviewed the same subjects, the Legal Advisor agreed to delay reconvening the board till August 13, 1986. AR at 822. In the weeks leading up to August 13, 1986, however, Mr. Doe apparently did not succeed in cross-examining or obtaining statements from Ms. N. or Ms. O., believing that such interviews, including those already conducted by Messrs. B. and T., were prohibited by the gag order. Upon a joint motion made by Mr. Doe's civilian counsel in Colorado Springs and by Jane's attorney, the El Paso County District Court issued a contempt citation to Ms. N., Ms. O., and Messrs. B. and T. on the grounds of having violated the gag order.[8] AR at 517–24.

After the evidence had been presented, the Legal Advisor addressed questions of the board members as to how to evaluate Ms. N.'s statements. The Legal Advisor cautioned the board to disregard those portions of the transfer summary and interview transcript in which Ms. N. expressed her personal opinion concerning the truthfulness of Jane's allegations against her father. AR at 868. Later, when charging the board to reach a decision at the end of the hearing, the Legal Advisor also gave the following instructions:

> The evidence in this case is generally hearsay evidence. And, you have before you many documents that are hearsay evidence. Hearsay is a statement which when—which is offered into evidence to prove the truth of the matters in the statement, but which is made—excuse me—but which is not made by the author of the statement as a witness before this board. I have determined there are safeguards for

the truth and have admitted the hearsay into evidence. You have the burden to decide what reliability and weight is to be given to this evidence. In making this determination you should consider the nature, effect, authenticity and circumstances of the statements. Also consider the fact that neither you, the government, nor the respondent have had the opportunity to confront or cross-examine the witnesses, nor have you had the opportunity to see the witness's demeanor.

AR at 895. Pursuant to the applicable regulations, the Legal Advisor also explained that good faith efforts had been made to obtain the live testimony of the hearsay declarants—*i.e.*, Ms. N., Ms. O., and Jane—and he explained why those efforts had been unsuccessful. AR at 868.

In addition to the transfer summary, the sheriff's report and the interview transcripts, the Legal Advisor admitted a sworn statement from Mr. G., plaintiff's prior attorney, denying that he had ever made the statements attributed to him in the sheriff's report concerning Mr. Doe's alleged confession. AR at 447. The Legal Advisor also admitted a statement from Mrs. Doe, who by that time was divorced from Mr. Doe for reasons which appear to have been unrelated to their daughter's allegations. In her statement, Mrs. Doe characterized the Air Force's attempts to discharge her ex-husband as a "witch hunt based on a questionable statement badgered out of an emotionally disturbed teenager." AR at 1172. Mr. Doe also made an unsworn statement in which he discussed his military career and the difficulties which his family had been experiencing during the time when the alleged molestation incident took place. He also said that "there was a considerable amount of false information" in his daughter's allegations.[9] AR at 872–77.

---

8. Ms. N. and Ms. O. were both ultimately found in contempt, but no penalty was imposed against either. AR at 615. As for Messrs. B. and T., their contempt actions were eventually removed to the United States District Court for the District of Colorado, where they entered an agreement with the court in which the charges would be dropped if they presented a seminar at a military law conference and published an article for dissemination among Air Force attorneys outlining

potential problems that arise from the interface of military investigations and civilian courts. AR at 648–60.

9. On April 9, 1986, Mr. Doe had made a similar statement in writing when he executed an affidavit stating that he had reviewed both the transfer summary and the sheriff's report and that "both documents contain considerable and substantial false information." AR at 459.

After deliberating briefly, the board returned a finding that Mr. Doe had conducted himself in a manner incompatible with exemplary standards of personal conduct, character and integrity as evidenced by indecent sexual acts with his minor daughter, Jane.[10] The board further recommended that Mr. Doe be removed from active duty and that the character of the discharge be "under other than honorable conditions." AR at 902. Accordingly, after losing an appeal to an Air Force Board of Review, Mr. Doe was discharged on February 13, 1987. AR at 218.

Mr. Doe subsequently sought a review of his case by an Air Force Board for Correction of Military Records ("AFBCMR" or "correction board"), arguing that the discharge board had based its decision on evidence obtained in violation of a state court order, resulting in a lack of due process. In September 1988, a majority of correction board members voted to deny Mr. Doe's request without a hearing. AR at 690. The correction board determined that insufficient relevant evidence had been presented to demonstrate the existence of probable error or injustice. AR at 689. In reviewing the facts, the AFBCMR found that the actions taken were within the established guidelines of Air Force policy and regulations. AR at 688. The board declined to rule as to whether the gag order had been violated. AR at 689.

In 1993 Mr. Doe renewed his efforts to obtain a reversal of his discharge. He requested, and was granted, a de novo review of his case before an AFBCMR. This time, Mr. Doe's request emphasized the ex parte nature of the interviews conducted with Ms. N. and Ms. O., as well as the illegality of the way in which the evidence against him was obtained.[11] AR at 3.

The AFBCMR issued its decision on April 19, 1993, rejecting Mr. Doe's contentions. Addressing the hearsay nature of the evidence used by the discharge board, the correction board characterized the Legal Advisor's decision to admit such evidence as follows:

> In the instant case, the legal advisor refused to admit [the transfer summary and the sheriff's report] until he was provided depositions which established to his satisfaction that the documents were what they purported to be; i.e., a case summary prepared by a social worker and a statement by a sheriff's detective. Although it appears the depositions were obtained in violation of a court-imposed gag order, we believe the legal advisor had a reasonable basis for concluding the documents were admissible. While applicant obviously disagreed then and now with the decision of the legal advisor, he was afforded an opportunity to offer opposing arguments to the admissibility of the documents and, when that failed, to point out the evidentiary shortcomings of these documents to the board. We cannot conclude, as applicant urges, that the evidence relied upon by the board was legally objectionable or insufficient.

AR at 7.

With regard to the ex parte nature of the interviews, the correction board conceded that "it would have been preferable" for the hearsay declarants to have provided live testimony to the board or for plaintiff's attorney to depose the witnesses, but the board concluded that such defects were not fatal. *Id.* The board further noted:

> [A]lthough on notice that the Air Force was going to try to develop indicia of reliability through the interview of witnesses, [Mr. Doe's] counsel at the Board of Inquiry objected to the delay, but apparently did not object to the process on the basis of ex parte communications or denial of due process.

---

10. Air Force Regulations provide that administrative separation procedures are appropriate upon a finding that a service member has committed an "[i]ndecent act[ ] with assault on a minor child." AFR 36–2, Ch. 3, ¶ 3–7i(3).

11. In addition to those mentioned here, Mr. Doe raised other arguments before the 1993 correction board, namely that "command influence" was unlawfully exerted on the legal advisor during the discharge board hearing and that, under the doctrine of "constructive waiver," Mr. Doe should have been retained on active duty. Neither argument is before the court in the present action.

*Id.* In charging plaintiff with being "on notice" that the Air Force intended to attempt to interview witnesses, the AFBCMR was apparently referring to the following statement made by the recorder when he requested that the proceedings be delayed:

> The delay is first of all to gather evidence to establish some of the smaller details that previously was not anticipated we would have to establish to bolster indicias of reliability surrounding [Jane's] statement. It is the government's position that we would intend to reoffer that statement at a later time, after those are established—things like that there was a camping trip at that time; that respondent and [Jane] did go on that camping trip; also, *we would like to go back to Colorado after reviewing the gag order once again, there may be some room for us to force some of the State officials to talk to us, so we wouldn't have so much hearsay in this case.*

AR at 809 (emphasis added).

### *Contentions of the Parties*

In support of his motion for summary judgment, plaintiff contends that he was denied a "fair and impartial hearing" by the discharge board, in violation of 10 U.S.C. § 1182(b) and AFR 11–31 ¶ 1 and AFR 36–2, ¶ 7–1. Consequently, Mr. Doe believes that the discharge board's action was arbitrary, capricious, contrary to law and regulation, and not supported by substantial evidence.

Mr. Doe argues that the Legal Advisor who presided over the board of inquiry hearing erred by admitting the transfer summary and the sheriff's report, both of which contained hearsay and double-hearsay evidence lacking adequate safeguards for the truth. The Legal Advisor further erred, plaintiff contends, by admitting into evidence the transcripts of the interviews conducted with Ms. N. and Ms. O. Plaintiff argues that the transcripts should have been excluded, in the first instance, because they were obtained in violation of a state court order. Furthermore, Mr. Doe argues, the transcripts were obtained under ex parte circumstances, without confrontation or cross-examination by Mr. Doe or his counsel. Moreover, plaintiff argues that the fact that the interviews were obtained in violation of a state court order suggests bad faith.[12]

Defendant counters plaintiff's statutory and regulatory arguments by contending that Mr. Doe's discharge hearing was fair and impartial, and that the Legal Advisor did not err by admitting the transfer report and the sheriff's report. On the contrary, defendant contends that the Legal Advisor correctly determined that sufficient safeguards for the truth existed to permit the board to examine those exhibits. Specifically, defendant points out that the Legal Advisor, after ruling on the admissibility of the contested exhibits,

---

12. Mr. Doe further asserts that, as a result of the Legal Advisor's missteps, he was discharged in violation of his rights under the Fifth Amendment of the Constitution, which guarantees that no person shall be "deprived of life, liberty, or property, without due process of law." Plaintiff does not specify whether he was deprived of liberty or property as a result of the Air Force's actions, but instead argues that aspects of his discharge showed a lack of "fundamental fairness," suggesting a violation of substantive due process. In particular, plaintiff points to the Air Force's extraordinary efforts to obtain evidence against him, which went so far as to obtain the interviews of Ms. N. and Ms. O. in an ex parte manner and in violation of an explicit court order—an order which limited his own actions as well as those of the Air Force investigators.

Because plaintiff does not assert the Fifth Amendment as a separate basis for recovery, and because the court construes its jurisdiction in military pay cases narrowly, the court declines to analyze Mr. Doe's discharge under a substantive due process theory. Nonetheless, the "fundamental fairness" of Mr. Doe's discharge shall be addressed with regard to the regulations and procedures under which plaintiff was discharged.

Mr. Doe also asserts that because the interviews were obtained in violation of the law, his rights under the Fourth Amendment's prohibition against unreasonable searches and seizures were violated. On that basis, Mr. Doe argues that the Legal Advisor should have excluded the interview transcripts pursuant to the exclusionary rule applicable in criminal and some civil cases.

While the court is certainly disturbed by the Air Force's efforts to gather evidence in blatant disregard of a duly issued order by a state court, the court shall nonetheless follow precedent holding that the exclusionary rule is inapplicable in military discharge proceedings. *Varn v. United States*, 13 Cl.Ct. 391, 396 (1987).

granted Mr. Doe's motion for a delay in the proceedings to give him an opportunity to attempt to interview the same witnesses interviewed by the Air Force. Even though Mr. Doe failed to interview the witnesses, defendant contends that the opportunity given to plaintiff for that purpose satisfied the minimum standards necessary for the admissibility of hearsay evidence under the applicable regulations. Defendant further contends that plaintiff has never denied that the alleged molestation incident took place. Moreover, defendant maintains that the Legal Advisor's limiting instructions to the board remedied any potentially unfair prejudice that might have otherwise arisen via the contested government exhibits.

With regard to the transcripts of the ex parte interviews conducted in violation of the state court order, defendant argues that the Legal Advisor was correct to conclude that the transcripts of those interviews were admissible despite the fact that they were obtained illegally. Again, defendant argues that the Legal Advisor's instructions concerning the transcripts provided sufficient guidance to obviate any unduly prejudicial effect.

As for the fact that the Air Force investigators interviewed Ms. N. and Ms. O. in violation of a state court order, defendant insists that the officers acted in good faith.

### DISCUSSION

#### I.

■ Since the court has considered matters presented by the parties outside of the pleadings, it shall treat defendant's motion to dismiss and alternative summary judgment motion as simply a motion for summary judgment. The disposition of a case on a motion for summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c). In evaluating a motion for summary judgment, the court is compelled to resolve any doubt about the existence of a genuine issue of fact in favor of the nonmoving party. *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972). In this case,

neither party has raised any genuine issue of material fact which would preclude summary judgment. Therefore, the court finds that the issue of liability in this case is ready for disposition on the parties' cross-motions. *Hodosh v. Block Drug Co.,* 786 F.2d 1136, 1141 (Fed.Cir.1986), *cert. denied,* 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562–63 (Fed.Cir.1987).

#### II.

■ Plaintiff asserts this court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491, which empowers this court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department," so long as the statutory, regulatory or constitutional provision on which the claim is based explicitly or implicitly mandates the payment of money. *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *Dehne v. United States,* 970 F.2d 890, 893 (Fed.Cir. 1992). The sole basis for jurisdiction asserted under Mr. Doe's amended complaint is 37 U.S.C. § 204, the statutory provision authorizing pay for career military officers. Binding precedents have held that involuntarily discharged military personnel may rely on pay statutes to invoke this court's Tucker Act jurisdiction. *E.g., Adkins v. United States,* 68 F.3d 1317, 1321 (Fed.Cir.1995); *Sargisson v. United States,* 913 F.2d 918, 920 (Fed.Cir. 1990); *Voge v. United States,* 844 F.2d 776, 779 (Fed.Cir.1988); *Heisig v. United States,* 719 F.2d 1153, 1155 (Fed.Cir.1983).

#### III.

■ Judicial review of an administrative decision to discharge a military officer is limited. When a branch of the armed forces has made a decision concerning who is and is not fit to serve, that decision is generally entitled to great deference. *Orloff v. Willoughby,* 345 U.S. 83, 90, 73 S.Ct. 534, 538– 39, 97 L.Ed. 842 (1953); *Maier v. Orr,* 754 F.2d 973, 984 (Fed.Cir.1985); *Brenner v. United States,* 202 Ct.Cl. 678, 692 (1973), *cert. denied,* 419 U.S. 831, 95 S.Ct. 54, 42 L.Ed.2d 56 (1974). Furthermore, to prevail

in this court, a plaintiff must "overcome the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979) (citations omitted). The court may set aside the administrative discharge of a military officer only upon a showing that the discharge was arbitrary, capricious, in bad faith, unsupported by substantial evidence, or contrary to law. *Chappell v. Wallace,* 462 U.S. 296, 303, 103 S.Ct. 2362, 2367, 76 L.Ed.2d 586 (1983); *Heisig,* 719 F.2d at 1156 (citations omitted); *Dzialo v. United States,* 5 Cl.Ct. 554, 561 (1984) (citations omitted). The court's focus in undertaking such a review, it must be emphasized, is in determining whether the military has properly followed discharge procedures established by statute or regulation, and not a review of the merits of the military's decision to discharge a particular individual. *Adkins v. United States,* 68 F.3d at 1323–23; *Murphy v. United States,* 993 F.2d 871, 873 (Fed.Cir.1993).

## IV.

It is well-settled law that the rules of evidence which apply in the courtroom are generally not applicable in administrative proceedings. In a courtroom trial, strict evidentiary safeguards are considered vital because there is an assumption that a jury of laymen will rely on the evidence presented to it without regard to whether the reliability of the evidence has been established. McCormick on Evidence, 4th ed., § 353. Accordingly, a trial judge applies evidentiary rules specifically to prevent dubious evidence from being presented to the jurors. The paradigmatic administrative hearing officer, on the other hand, is generally deemed to have the professional wisdom and experience needed to discern the trustworthy from the untrustworthy. Consequently, the risk of unreliable evidence unduly influencing the hearing officer's decision-making is minimal. *Id.*

An Air Force board of inquiry is a proceeding having characteristics similar to both a jury trial and a typical administrative hearing. The Legal Advisor who presides over the hearing is a lawyer who has been special-ly certified according to Article 27(b) 10 U.S.C.A. § 827(b) of the Uniform Code of Military Justice. Like a trial judge, the Legal Advisor "rules with finality on challenges for cause and all evidentiary and procedural matters," but unlike a trial judge he is not empowered to dismiss the charges against the accused, nor terminate the proceedings. AFR 11–31 ¶ 2.b. The Legal Advisor has no vote, nor does he participate in the panel's deliberations. Like a trial jury, the voting board members are not legal professionals. However, they are generally senior military officers. *Id.* at ¶ 2.a. With few exceptions, the board members, like a trial jury, are free to evaluate the evidence as they see fit, once the Legal Advisor has admitted the evidence and given the board instructions. The standard of proof in a board of inquiry proceeding is the somewhat liberal "preponderance of the evidence" standard. *Id.* at ¶ 3a(8).

Because of the distinctions between an Air Force discharge board and the paradigmatic hearing before an administrative officer—*i.e.,* distinctions which, in certain respects, make discharge hearings more similar to jury trials—the Legal Advisor must exercise an intermediate level of caution concerning the admissibility of evidence in order to ensure the fairness and impartiality of the proceedings. In other words, a level of caution is needed which is less than would be required in an actual jury trial, but more than would be needed if the decision-maker were a single, professional hearing officer rather than a panel of laymen. With regard to hearsay evidence, the evidentiary rules set forth at AFR 11–31 ¶ 3a(4) take precisely the intermediate approach toward admissibility and other evidentiary concerns discussed here:

> Hearsay evidence is admissible provided the Legal Advisor determines that there is adequate safeguard for truth. However, upon request, a respondent is afforded an opportunity at the hearing to confront an individual whose testimony was admitted as hearsay. Exceptions are instances where, because of lack of subpoena power, the individual cannot be compelled to attend; and instances where, because of inordinate distance or demands of the service, it is unreasonable for him or her to attend. In these cases a respondent then

is afforded an opportunity to obtain a deposition from the individual for submission to the board. If a deposition cannot be reasonably obtained, a respondent is afforded an opportunity to obtain a sworn statement from (or propound interrogatories to) the individual for submission to the board. A respondent's failure to exercise the foregoing opportunities or his or her inability to do so does not affect the admissibility of hearsay evidence. If the deposition or sworn statement has not been produced, despite the good faith efforts of the respondent, the Legal Advisor advises the board that such a good faith effort has been undertaken and states the reasons that the deposition or sworn statement cannot be produced.

In an Air Force discharge proceeding, the regulation quoted above establishes a rather liberal standard of admissibility, but not without precautions. Hearsay evidence may be admitted as long as the Legal Advisor determines that "adequate safeguards for truth" are present. Moreover, even though the regulation provides that a respondent must be given an opportunity to confront or cross-examine opposing witnesses, either by obtaining the presence of those witnesses at the board of inquiry hearing or by obtaining separate depositions or sworn statements of those witnesses, the Legal Advisor is not obligated to exclude evidence on the ground that a respondent has been unsuccessful in obtaining testimony from his accusers.

In reviewing cases arising from other administrative contexts, courts have recognized that hearsay and even double hearsay can constitute substantial evidence to a fact finder if circumstances exist to establish the reliability of the hearsay or double-hearsay evidence. *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 1427–28, 28 L.Ed.2d 842 (1971). Evidence is "substantial" if it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales,* 402 U.S. at 401, 91 S.Ct. at 1427 (citations omitted); *McKee v. United States,* 205 Ct.Cl. 303, 310, 500 F.2d 525, 528 (1974).

In *Perales* the Supreme Court made clear that the reliability of hearsay evidence in the administrative context can be established in a variety of ways. The appellee in *Perales* was a Social Security claimant who had been denied disability benefits based in part on written medical reports submitted to the hearing officer by physicians who had examined him and found him capable of work. *Perales,* 402 U.S. at 396–97, 91 S.Ct. at 1424–25. In finding that the medical reports, which were hearsay and in some cases double hearsay, could constitute substantial evidence, the Court noted, among other things, the fact that the physicians' opinions were based on a physical examination of the claimant, the fact that all of the medical opinions were consistent, and the fact that the claimant failed to take advantage of opportunities to confront the physicians himself through a pre-hearing subpoena procedure established in the applicable regulations. *Id. Perales* thus stands for the principle that, in the administrative context, the reliability of hearsay statements as substantial evidence can be established both by the factual circumstances under which such statements were made and by established procedures which afford the individual against whose interests such hearsay is offered an opportunity to obtain evidence to show why such hearsay should not be relied upon.

In Mr. Doe's case, the Legal Advisor allowed a number of hearsay statements to be presented to the board for consideration. Many of the admitted hearsay statements were, in fact, written expressions of support and admiration for Mr. Doe which were submitted by fellow officers and colleagues; their admission is uncontested. Of course, with the exception of his former wife's statement, none of the admitted favorable hearsay statements addressed the allegation of misconduct which was the basis of the discharge proceedings, and the admission of those statements into evidence is also uncontested.

■ With regard to the contested statements, a threshold consideration is to determine whether the record and the pleadings of this case correctly characterize them as "hearsay." The statements which plaintiff contends were admitted in error were the sheriff's report (of which Ms. O. would be the declarant); and the transfer summary (of

which Ms. N. would be the declarant). Both of these documents contained reports of statements made by others, *i.e.*, Mr. G.'s reported statements to Ms. O. in the sheriff's report and Jane's reported statements to Ms. N. in the transfer summary. These contested aspects of the sheriff's report and the transfer summary, in fact, were double-hearsay statements because Jane's and Mr. G.'s remarks were reported in documents written by other persons.

The characterization of evidence as "hearsay" generally depends on the function for which it is introduced. A tribunal will ordinarily characterize a statement as hearsay—and treat it as such for the purpose of evidentiary rulings—only if it is offered to prove the truth of the matter that the statement asserts. *See* FRE 801. A statement offered to prove a matter other than what the statement asserts generally falls outside of the scope of the traditional definition of hearsay. For example, a statement offered to prove the fact of utterance or the state of mind of the declarant would ordinarily be admissible. *See* FRE 803.

In the present case, the record demonstrates that the Recorder offered, and the Legal Advisor admitted, the contested hearsay and double-hearsay statements for the purpose of proving the matters which they asserted. In other words, the transfer summary and the sheriff's report were offered and admitted for the purpose of proving that Jane's allegations were true. Consequently, those statements are correctly characterized as hearsay and double hearsay. As such, under the applicable Air Force regulation discussed above, the hearsay statements of Ms. N. and Ms. O. and the double-hearsay statements of Jane and Mr. G. should not have been admitted into evidence unless the Legal Advisor determined there were adequate "safeguards for truth." AFR 11–31 ¶ 3a(4). The regulation does not define what is meant by the phrase "safeguard for truth,"

but the court understands the phrase to mean that the reliability of the hearsay statement, as evidence of the truth, can be fairly evaluated by considering other evidence or factors known to the board members, including instructions provided by the Legal Advisor.

The record, as discussed earlier, shows that the Legal Advisor was initially reluctant to allow the contested hearsay statements to be admitted into evidence. AR at 805–08. One of his concerns was that the transfer summary and the sheriff's report were not signed by their purported authors, so it was unclear whether Ms. N. and Ms. O. actually wrote them. But authenticity was only one problem.[13] The Legal Advisor was also concerned about the reliability of Jane's allegations in light of other hearsay evidence in the record which suggested that when she was admitted to the psychiatric hospital in 1982, she was experiencing a number of other difficulties. These included possible drug abuse, a recent breakup with a much older boyfriend, premarital sex, and difficulties in school. In the Legal Advisor's view, at least initially, this additional evidence of Jane's troubled psychological state at the time she leveled her accusations weakened the reliability of the statements she made at that time. Based on these doubts, the Legal Advisor granted the Recorder's request for a delay in the proceedings not simply to allow the Air Force to obtain further authentication for the documents but also to develop, in his own words, "indicias of reliability surrounding [Jane's] statement." AR at 809.

The Legal Advisor stated upon admitting the hearsay evidence that he was satisfied that there were adequate safeguards for the truth. AR at 819. The court notes, however, that the record of the discharge proceedings is devoid of any clear explanation by the Legal Advisor as to what he considered the safeguards in this case to be or how they

---

**13.** While the interview transcripts may have resolved any ambiguities concerning the authorship of the transfer summary and the sheriff's report, the *authenticity* of those documents (though challenged by Mr. Doe) was never seriously in doubt. Moreover, such efforts were redundant because the agencies which generated the original versions of those documents provided a written certification of the authenticity of each of the Air Force's copies. Although the date when those certifications were executed is unknown, they must have been executed prior to the first day of the hearing (July 2, 1986) because the transcript makes reference to both the transfer summary and the sheriff's report as having been "certified as authentic." AR at 799.

were satisfied by the interview transcripts. The Legal Advisor did suggest that admitting the transfer summary was justified because, according to the interview transcript, Ms. N. "had at least two years experience" when she met Jane and that "she found the allegations ... sufficiently credible" to refer the matter to law enforcement authorities." *Id.* Later, however, the Legal Advisor determined in the presence of the board members that Ms. N. was not qualified as an expert witness. AR at 884–85. The Legal Advisor also instructed the board members not to give any weight to Ms. N.'s statements regarding Jane's credibility. AR at 868. In view of these later comments, the Legal Advisor's initial determination that the interview transcript provided "adequate safeguards" to permit the admission of the transfer summary remains, to this court, mysterious.

As discussed earlier, the AFBCMR was satisfied that the Legal Advisor had acted correctly because he admitted the transfer summary and the sheriff's report only after "he was provided depositions which established to his satisfaction that the documents were what they purported to be; i.e., a case summary prepared by a social worker and a statement by a sheriff's detective." AR at 7. However, as explained above, authenticity was only one of the relevant factors which concerned the Legal Advisor. A second—and probably greater—concern of the Legal Advisor was whether the double-hearsay statements contained in the two reports conveyed the truth about what, if anything, occurred between Mr. Doe and his daughter. The correction board appears to have ignored (or perhaps discounted) this valid concern for the basic reliability of the molestation allegations over and above the authenticity of the documents in which the allegations are contained.

Nevertheless, the failure of the Legal Advisor to articulate a clear rationale for his determination that adequate safeguards existed for the admission of the transfer summary does not necessarily invalidate the discharge proceedings as a whole, even if this court might not agree with the Legal Advisor's determination. *See Beasley v. United*

*States,* 21 Cl.Ct. 236, 244 (1990). It must be emphasized that the applicable regulation explicitly favors the admission of all relevant evidence, with few exceptions. AFR 11–31 ¶ 3a. In addition, the same regulation specifies that the admissibility of hearsay statements in a discharge hearing does not depend on a respondent's ability to produce contradictory evidence. *Id.* at ¶ 3a(4). Accordingly, the Legal Advisor's determination that the hearsay and double-hearsay statements were admissible is entitled by regulation to a substantial degree of deference.

The court observes that the transfer summary was presented to the board with several cautionary warnings by the Legal Advisor. The board members were advised of the circumstances under which Jane's statement was made, and they were also advised that, due to the hearsay nature of the statement, it was within their discretion how much weight to accord to Jane's accusations. Both Mr. Doe's counsel and the Recorder, furthermore, were permitted to make arguments for and against the believability of Jane's statement. The cumulative effect of this dialogue before the board was to limit the prejudicial effect of presenting Jane's accusations without any caveats.

Another factor which probably contributed to the board's decision as to how much weight to give to Jane's accusations was the fact that Jane had been given several opportunities to come forward and retract her accusations, either through live testimony or by submitting a written statement. Jane refused to do either. AR at 1060–64. The board members took special interest in this fact, and upon their request they were shown correspondence between Jane's attorney and the Air Force. AR at 800. The correspondence indicated that Jane, now an adult, had been advised of the gravity of the charges pending against her father and that her testimony in his behalf would be crucial to his defense. Jane's unwillingness to amend her five-year-old accusations against her father no doubt gave her original story more credibility in the eyes of the board members than it might have otherwise had.

Yet another factor which the board might have considered in weighing the believability

of Jane's accusation was Mr. Doe's own testimony. Mr. Doe gave an unsworn statement, and as a result he could not be cross-examined. He had the option of presenting sworn testimony but declined to exercise it. Furthermore, in his unsworn statement Mr. Doe did not categorically deny his daughter's accusations. Instead, he only stated that the transfer summary contained "a considerable amount of false information," and he did not specify which aspects of Jane's allegations were false and which were not. Certainly, the applicable regulation did not impose any burden on Mr. Doe to present evidence in his own behalf, AFR 11–31 ¶ 3a(1), but such a rule is not tantamount to the presumption of innocence that exists in criminal law. Like hearsay, unsworn testimony is inherently less reliable than testimony received by the fact finder under oath, but the court is aware of no authority which would require the board to give more weight to unsworn live testimony than to documented hearsay and double-hearsay statements.[14]

Viewing as a whole the factual circumstances under which the board was presented with the transfer summary, the Legal Advisor's instructions regarding the same, and the procedures available to Mr. Doe to counter the accusations contained in the transfer summary, the board's decision to give credit to Jane's accusation was not the product of unfairness.

■ The court turns now to the sheriff's report, which contained Ms. O.'s recollection of Mr. G.'s comment to her that Mr. G.'s client, Mr. Doe, had "confessed" that the molestation incident described in the transfer summary had indeed taken place. The Legal Advisor's initial decision to admit the sheriff's report into evidence was predicated on the fact that the transfer summary provided corroboration for the reference in the sheriff's report to Jane's specific accusation. Having determined that the transfer summary was admissible, the Legal Advisor's decision to admit the sheriff's report logically followed. If, however, the Legal Advisor had been incorrect in deciding to admit the transfer summary, then his admission of the sheriff's report would also be incorrect. But since the court has declined to find the admission of the transfer summary to have been in error, the court must consequently hold the admission of the sheriff's report not to have been in error.

The court notes that just as Mr. Doe was given an opportunity to deny his daughter's accusations before the board, he was also permitted to present evidence contradicting the damning statements contained in the sheriff's report. Thus, along with the sheriff's report the board was given the affidavit of Mr. G. denying that he had made the comments attributed to him by Ms. O. in the sheriff's report. In light of the Legal Advisor's instructions concerning hearsay statements, the board had sufficient knowledge to weigh and determine the reliability of the conflicting evidence concerning Mr. Doe's alleged confession to Mr. G.

■ Finally, with regard to the Legal Advisor's decision to admit the interview transcripts, the court observes that under the applicable regulation the Legal Advisor was not required to exclude the transcripts merely because Mr. Doe did not succeed in obtaining similar interviews from the same subjects. That conclusion is not changed by the fact that those interviews were obtained in a blatant violation of a court-imposed gag order. It is likewise unavailing that Mr. Doe would have had to violate the same gag order in order to obtain similar statements from Ms. N. and Ms. O. The applicable regulation does not address the specific reasons why a respondent might be unable to obtain statements contradicting hearsay evidence proffered by the Recorder; it merely states that a respondent's failure to obtain such evidence does not compel the Legal Advisor to exclude hearsay evidence proffered by the Recorder. The court notes, further, that the Legal Advisor instructed the board members to give no weight to comments by the interviewees bearing on Jane Doe's credibility. AR at 868. Such a limiting instruction was appropriate because neither Ms. N. nor Ms. O. was qualified to render an expert opinion on

---

**14.** *Cf. McClees v. Sullivan,* 879 F.2d 451, 453 (8th Cir.1989) (holding that "mere hearsay which lacks reliability" cannot overcome sworn testimony).

Jane's credibility, as the Legal Advisor explained to the board. Accordingly, the prejudicial effect of the statements was dampened by the Legal Advisor's limiting instructions.

### V.

■ Plaintiff's only remaining contention is that his discharge was in bad faith because the Air Force investigators, Messrs. B. and T., obtained evidence in violation of a state court order. There appears to be no dispute that the interviews with Ms. N. and Ms. O. were undertaken in violation of a duly issued gag order. Defendant, however, stresses that the Air Force was hamstrung by the gag order in its efforts to obtain information about the Doe family case, and that such information was necessary in order to evaluate Mr. Doe's fitness for duty. Defendant further maintains that Messrs. B. and T. attempted to work within the bounds of the order and did not intentionally violate the order in interviewing Ms. N. and Ms. O.

The court considers the fact that the interviews were obtained illegally to be immaterial. Whether Messrs. B. and T. acted intentionally or unintentionally in violating the gag order, they were acting merely as investigators. They had no further involvement in Mr. Doe's discharge proceedings. It was the Legal Advisor who decided independently to admit the interview transcripts, the transfer summary and the sheriff's report into evidence, and it was the board of inquiry which ultimately voted to recommend that Mr. Doe be discharged. The Legal Advisor and the board members enjoy a rebuttable presumption of good faith in discharging their duties. *Sanders*, 219 Ct.Cl. at 302, 594 F.2d at 813. Mr. Doe, however, has failed to overcome that presumption by demonstrating any bad faith on the part of either the Legal Advisor or the board members.

### CONCLUSION

In summary, the court finds that the applicable discharge regulations in Mr. Doe's case were followed appropriately. Specifically, the Legal Advisor permissibly exercised his discretion in applying applicable Air Force regulations to admit into evidence the transfer summary, the sheriff's report, and the interview transcripts. Consequently, Mr. Doe's discharge was not arbitrary, capricious, or contrary to law or regulation. In addition, Mr. Doe's failure to present reliable evidence clearly contradicting the accusations made by his daughter properly resulted in the board's treatment of those accusations, in hearsay form, as "substantial evidence" supporting their findings. Finally, Mr. Doe has failed to overcome the presumption of good faith on the part of those officers who determined that he should be discharged.

For the foregoing reasons, defendant's motion for summary judgment is GRANTED, and plaintiff's cross-motion for summary judgment is DENIED. The Clerk shall enter judgment accordingly. No costs.